IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 20, 2006

## STATE OF TENNESSEE v. HOWARD GAILAND BRUFF

**Appeal from the Criminal Court for Cumberland County**
**No. 8244     Lillie Ann Sells, Judge**

_____

**No. E2006-01070-CCA-R3-CD**

_____

The defendant, Howard Gailand Bruff, was convicted of first degree premeditated murder, felony murder, and especially aggravated robbery. The murder convictions were merged, and the defendant received concurrent sentences of life and twenty-five years in prison. On appeal, the defendant contends that the evidence was insufficient to establish his convictions because the circumstantial evidence was not sufficient to prove his identity as the assailant, that he committed a theft against the victim, that he had the requisite intent to rob the victim to be convicted of felony murder, or that he killed the victim with premeditation. We conclude that the evidence is sufficient, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Thomas D. Beesley, Crossville, Tennessee, for the appellant, Howard Gailand Bruff.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William Edward Gibson, District Attorney General; Gary McKenzie, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On March 31, 2004, Kevin Hixson was found murdered in his home in Tansi as a result of two gunshot wounds to the head. At the trial, the victim's father, Junior Hixson, testified that he became concerned about the victim after receiving a telephone call from the victim's mother on Wednesday, March 31, 2004. The victim's mother told him that the victim was supposed to visit her in Alabama but that she had not heard from the victim since Monday, March 29. Mr. Hixson drove to the victim's mobile home around 6:00 that evening. He said the victim's truck was in the driveway and the victim's cellular telephone was plugged into the lighter in the truck. He said he knocked on the victim's doors and called out the victim's name but received no answer. He reported

the situation to the Cumberland County Sheriff's Department.  A Tansi Security officer arrived, and a locksmith opened the door to the victim's house.  Mr. Hixson said he smelled a foul odor as soon as the doors opened.  They found the victim dead inside the house.

Cumberland County Sheriff's Department Investigator Scott Griffin testified that he investigated the homicide of Kevin Hixson.  He said the victim's body was found in the living room of the victim's house.  He took photographs of the victim and the crime scene.  The photographs showed the victim lying on the floor near the television and entertainment center.  They showed blood running down the side of the entertainment center and a pool of blood on the floor by the entertainment center.  The television was on, with the message "Searching for satellite signal" displayed. Investigator Griffin said a drill box was found in the living room near the front door.  He theorized that at the time of his death, the victim was working on his satellite connection.  He said that he thought the victim suffered only one gunshot wound to the head.  The next day, however, the medical examiner informed him that the victim had two gunshot wounds to the head.  Investigator Griffin said one projectile was found in the victim's head during the autopsy.  The investigators returned to the scene to locate the second projectile, which they found lodged in the floorboard in the victim's living room.  He testified that the left-front pocket of the victim's shorts was "partially pulled out, part of the way out of the hole itself," and that the victim's shirt was "pulled up above the belt line."

Investigator Griffin testified that three houses were visible from the victim's.  He said he could see clearly the house of Pat Williams from the victim's front porch.  He said that although trees were between the victim's and Ms. Williams' houses, in late March the foliage had not grown to obscure his view of Ms. Williams' house.  He said he and other agents, officers, and investigators, conducted several interviews related to the victim's death.  He said that based on the interviews, the defendant became the suspect of the victim's murder.

On cross-examination, Investigator Griffin testified that none of the defendant's fingerprints were found on an assortment of items taken from the crime scene, including ammunition, a cigarette butt, an ashtray, and beer cans.  He said, however, that the ammunition taken from the crime scene was live and was not the same caliber as the spent projectiles recovered from the victim.  He stated that money was found in the victim's residence in a metal canister under the kitchen sink but that no money was found on the victim.

Cumberland County Sheriff's Department Investigator Dan Friel testified that he assisted in the investigation of Kevin Hixson's homicide a few days after the body was discovered.  He said he interviewed Pat Williams three times on two days, April 1 and April 7, 2004.  He said he could see the victim's house from Ms. Williams' house.  He said Ms. Williams identified a photograph of a 1976 Ford pickup truck that was found behind Starwood Market on April 7, 2004, as the vehicle she saw at the victim's house on March 29, 2004.  On cross-examination, Investigator Friel testified that he interviewed the victim's brother, Chris Hixson, while he was incarcerated.  He said he did not recall the interview.  He said he also did not recall the names of any suspects in the victim's case aside from the defendant.

Patricia Williams testified that she had known the victim for ten years and had lived across the road from the victim for nearly three years. She said that on March 29, 2004, between 1:30 and 2:00 p.m., she was sitting on her front porch having a telephone conversation with her friend, Diane Conatser, when she saw the victim walk to his mailbox while talking on his cellular telephone. She said that shortly thereafter, she saw a truck drive quickly down the road and pull into the victim's driveway. She said there was a ladder in the bed of the truck. She said a man left the truck and propped the ladder against the back of the victim's house. She said the man then went into the house through the front door. She said the man was dressed in a long-sleeved shirt with a short-sleeved t-shirt over it and long shorts. She said that approximately twenty to thirty minutes later, the visitor left the victim's house, threw the ladder into the bed of the truck, and quickly drove out of the driveway. She said he was "in a real hurry" and that the truck was "throwing" gravel as it drove out of the victim's driveway. She was on the telephone with Ms. Conatser the entire time the visitor was at the victim's house, and she told Ms. Conatser about the visitor, including that he was "throwing" gravel.

Ms. Williams testified that when she was first interviewed by investigators on Thursday, April 1, she said the incident happened the previous Tuesday. She said she discovered she was mistaken about the date because Ms. Conatser, after looking at her caller-ID, informed Ms. Williams that the incident occurred on Monday. She said she was now certain that it occurred on Monday, March 29. Ms. Williams said an investigator showed her a photograph of a truck, which she identified as the truck she saw at the victim's house on March 29.

On cross-examination, Ms. Williams testified that she had a police scanner in her home that picked up police, sheriff, and fire reports but that she was not listening to the scanner the night of March 31, 2004. She said she found out police were in her neighborhood on March 31 because someone else who was listening to a scanner told her. She said that on the evening of March 31, 2004, a police officer interviewed her and that she did not tell him about seeing the man with the truck and ladder. She said she could see the victim's driveway from her house and often saw cars coming to and leaving from the victim's house. She said it was not odd to see a truck like the one she saw on March 29 at the victim's house. She denied describing the truck to Diane Conatser as a "two-tone" truck or saying that it had red paint on it. She said she described it as a rusty, brown truck. She also denied seeing a truck on the television at Ms. Conatser's house and saying it looked like the truck she saw at the victim's house. Ms. Williams admitted that she told the defendant's investigator that she saw the victim talking on his cellular telephone while checking his mail at around 5:00 or 5:30 p.m. on March 29. She said she was certain she saw him sometime after 1:00 p.m.

Joan Mathes testified that she was a friend of the victim and knew him for seven or eight years. She said she had regular telephone conversations with the victim before his death. She said she received a call from the victim on March 29, 2004, in which he told her that someone–he did not say who–was coming to his house to work on his satellite television system. She said she ended her conversation with the defendant soon thereafter. She said that according to her caller-ID, the victim called her at 1:52 p.m.

Daren Houston testified that he and the victim were good friends. He said that shortly before the victim's death, the victim had started selling cocaine. He said he was acquainted with the defendant, whom the victim called Hojo, and knew that the victim sold cocaine to the defendant. Mr. Houston said the victim commonly kept cash in his billfold in his front pants pocket. He said the victim always had a couple hundred dollars in his possession. He said he last saw the victim on Sunday, March 28, 2004. He and the victim had spent much of that Saturday and Sunday together, and he left the victim's house around 5:00 p.m. on Sunday. He said the victim said nothing to him on Sunday regarding the victim's plans. He said that after receiving a telephone call from the victim's worried mother on the following Wednesday, March 31, he went to the victim's house and knocked on the door but received no answer.

Mr. Houston testified that the victim told him on that Sunday that his brother Chris was arrested the previous night. The victim told Mr. Houston that he was going to try to bail Chris from jail. Mr. Houston acknowledged that he told investigators that the victim had "started hanging around with a rough crowd," who he had guessed were drug dealers and buyers. He said he considered the defendant to be part of this "rough crowd." He said he was not involved in the victim's drug trade. He said he did not know how much money the victim had on his person on March 29, but he said he never saw the victim without cash in his possession.

Terry Amonette testified that he and his wife owned Starwood Market. He said he knew the defendant, who worked near the market and for whom he ran a charge account in the store. He said the defendant left the brown truck that investigators found and Ms. Williams identified behind his store. He said that at about 5:00 a.m. on Tuesday, March 30, 2004, the defendant called him and said he was going to come to the store, which opened at that time, to pay off some of his bill and to talk about something. Mr. Amonette said that at approximately 6:00 or 7:00 that morning, the defendant arrived at the store and paid $40, using a $100 bill, on his charge account. He said it looked like the defendant had a few hundred dollars in his pocket. He said that the defendant asked to borrow a vehicle because the defendant wanted to visit his dying mother in Michigan. Mr. Amonette said he offered his truck but his truck had a leaking hose, so he and the defendant drove together to an auto parts store in town. He described the defendant as being "jittery." He said the defendant asked him to be an alibi for him in case people came asking questions about the defendant. He said the defendant asked him to tell people that he was at Starwood Market on Monday, March 29. He said that during their drive to town, the defendant commented that "that son of a bitch might be dead." He said that when he asked the defendant what this comment meant, the defendant replied, "[w]ell you're just better off not to know." He said that this comment worried him and that he decided he would not let the defendant borrow his truck. He said that when he and the defendant returned to the market, he informed his wife and an employee not to allow the defendant to borrow a vehicle. He said that when they refused the defendant's request, the defendant asked to use a credit card so he could buy an airplane or bus ticket to visit his dying mother in Michigan.

On cross-examination, Mr. Amonette testified that the defendant had various charge accounts at Starwood Market over the course of three years. He said the defendant had always eventually paid off his accounts. He said he had traded cars with the defendant on prior occasions and that the

defendant said he was leaving his truck at the store because he wanted to sell it. Mr. Amonette said he gave the defendant permission to leave the truck there. He said that he once denied the defendant's offer to "take care of" a person who was causing Mr. Amonette problems, and that Mr. Amonette assumed the defendant was offering to "knock off" the person. Mr. Amonette admitted that the defendant was a "motormouth" who "ran his mouth a lot."

Cheryl Amonette, Terry Amonette's wife, testified that she saw the defendant at her store, Starwood Market, on March 30, 2004, when she arrived there at 8:30 or 9:00 a.m. She said that the defendant was acting nervous and jittery and that he was not laughing or joking as he usually was. She said that her husband and the defendant left the store to get a part for her husband's truck and that after they returned, her husband told her to give the defendant an excuse for why he could not borrow the truck. She said the defendant told her that if someone asked about the defendant's truck, which he was leaving at the store, she should say that it was at the store all day the previous Monday. Mrs. Amonette said that the defendant's hair was brown on March 30 and that it had always been brown, although he sometimes put different colored streaks in it. She agreed that the defendant was a "motormouth" but that he was not acting normally on March 30. She said she suspected the defendant may have been using drugs.

Teresa Stallings testified that she and the defendant were friends and that on Monday, April 5, 2004, the defendant called her and asked her to photograph him. She said the defendant had changed his hair color. She said the defendant had never before asked her to photograph him. She said that while at the defendant's house, she mentioned the victim's death. The defendant told her that he had not previously heard about it and that he and the victim were good friends. She said that the defendant appeared upset for a few minutes but that he then asked to go outside and take the photographs. She said she thought it was odd how quickly the defendant appeared to recover from the shock of hearing that his friend had been murdered.

Agent Tommy Calahan with the Tennessee Bureau of Investigation (TBI) testified that he was assigned to investigate the murder of Kevin Hixson. He said that on March 31, 2004, when the victim's body was discovered, he did not know the defendant or suspect him as the culprit. He said that when developing a suspect, he primarily considered a person's opportunity and motive to commit the crime. He said the investigation increasingly focused on the defendant as a suspect. He said he theorized that the victim had been robbed because no money or billfold was found on the victim. He said, though, that $317 was found in the victim's home in a container under the kitchen sink. After attending a seminar on advances in DNA technology, Agent Calahan had the idea of submitting the victim's shorts for DNA testing. After receiving the results of those tests, "the wheels started rolling" toward prosecuting the defendant.

Agent Calahan testified that he acquired and examined records of the victim's cellular telephone activity between March 15 and April 1, 2004. The records showed that the victim frequently used his cellular telephone at all hours of the day and night. According to the records, the last outgoing call on the victim's cellular telephone was at 2:21 p.m. on March 29 to Connie Phillips. The records showed that a call was made to Joan Mathes earlier that day at 1:51 p.m. and that a call

from the defendant was received at 2:04 p.m. On Saturday, March 27, the victim's telephone made 37 outgoing calls; on Sunday, March 28, it made 43; and on Monday, March 29, it made 42 calls until 2:21 p.m. No calls were made from the victim's telephone on March 30. Agent Calahan said that he considered the last outgoing call from the victim's telephone to be a clue indicating the approximate time of the victim's death.

Agent Calahan testified on cross-examination that the defendant, along with anyone else who had contact with the victim shortly before his death, became a "person of interest" around April 1. He said he became aware of the victim's drug dealing shortly after beginning the investigation. He acknowledged that the victim's brother gave him names of possible suspects but that he did not remember any of those other names. In particular, Chris Hixson informed Agent Calahan of a local businessman who had made threatening telephone calls to Chris and the victim because he was angry that his girlfriend was buying drugs from them. Agent Calahan said this person came to the sheriff's department after hearing of the victim's death, admitted making those telephone calls, and expressed concern that he would be considered a suspect. Agent Calahan admitted that this person had a motive to commit murder but did not know if he had the opportunity to do so. He also acknowledged that James Phillips' name was given to him by a witness as a possible suspect. He said he did not find the information implicating Mr. Phillips to be credible.

Agent Calahan testified that there was no evidence of a gun battle between the victim and the assailant. He admitted that he did not know exactly when the victim was killed but that he thought it was shortly after 2:21 p.m. on March 29. The records showed that the victim received incoming calls on his cellular telephone after that time but they were for very short durations and, he thought, unanswered. He admitted, though, that the telephone records showed previous periods of time when the victim did not make telephone calls and several prior incoming calls that were of very short duration. He said that the last telephone call the victim made at 2:21 p.m. was to Connie and James Phillips's cellular telephone and that between March 28 and 29, the victim received more calls from the Phillips than from anyone else. Agent Calahan said he knew that the Phillips bought drugs from the victim. He acknowledged that nothing found in the defendant's house or truck implicated the defendant in the crime, aside from some bills that the defendant paid on March 30, 2004.

Agent Calahan testified that the victim appeared to have been shot in the back of the head from about two to four feet away and that the second wound appeared to be a contact gunshot wound to the head, which he characterized as an "execution type slaying." He said he believed that the victim was initially shot in the back of the head, fell in the corner of the living room where the blood was found, was moved, was shot in the side of the head, and was robbed. He admitted that no blood was found on the defendant's clothes or in his truck. He said there was evidence that the defendant attempted to "cover-up" his crime, including that he hid his truck, asked for alibis, called the victim's cellular telephone after the killing, and changed his hair color.

TBI Special Agent Forensic Scientist Charles Hardy testified that he analyzed the victim's shorts by swabbing the pockets and identifying the DNA found. He said that the major contributor

of the DNA matched the defendant and that he could not exclude the victim as the minor contributor of the DNA. He said DNA could be transferred from a person's hand to a pocket through loose skin cells that are released while the hand is being placed in and pulled out of the pocket. He said that based on how much DNA he found from the major contributor, his opinion was that the major contributor was the last person to leave skin cells inside the pockets. He said this was the first time he ever tested pockets for DNA and was surprised by how much DNA he recovered. He said he used a separate swab on each of the four pockets, so he could not discern in which pocket or pockets the defendant's hand had been. He said he also analyzed a pair of shorts worn by the defendant and found that the blood on the shorts matched the defendant and not the victim. Special Agent Dan Royce testified that he examined the two bullet fragments recovered from the victim's head and the floor of the victim's house and found that they came from the same .32 caliber automatic gun.

Davidson County Assistant Medical Examiner Dr. Feng Li testified that he was a forensic pathologist and that he performed an autopsy on the victim. He determined that the manner of death was homicide by two gunshot wounds to the head. He said the victim sustained a contact gunshot wound to his left temple and a more distant gunshot wound to the back of the head. He said it was more likely that the victim first sustained the wound to the back of the head. He said there was no way of knowing the actual time of death and that the official time of death listed was March 31, 2004, at 11:44 p.m., after the body was discovered. Dr. Li testified that he found a significant amount of cocaine and metabolites in the victim's body and that the victim's blood alcohol content was .12%.

Melinda Farr testified that she dated James Phillips's brother. She said that James Phillips told her that he killed the victim and that she told investigators this. She said she was not interviewed by investigators a second time. She said she thought Mr. Phillips's statement was "just a macho remark" and did not think it was true at the time he told her.

Joan Poisson testified that she was a neighbor of the victim and that she could see his house from her house. She said she last saw the victim alive on Monday, March 29, 2004, between 4:30 and 5:00 p.m. She said she was in the yard when she saw the victim come home at this time, check his mail, go inside his house, and leave again. She said she told this to investigators who interviewed her. She said she knew it was between 4:30 and 5:00 p.m. because that was the time that she started making supper for her husband, who ate at the same time every day. She said that she was blind in one eye but that it did not prevent her from being able to see the victim. She said that she had seen a rusty Ford pick-up truck at the victim's house in the past but that she did not see such a truck there on March 29.

Diane Conatser testified that she and Pat Williams were good friends. She said she had a phone conversation with Ms. Williams on Monday, March 29, 2004, between noon and 2:00 p.m. She said she was certain she ended her conversation with Ms. Williams before 2:00 p.m. because that was the time that she left home to pick up her daughter. She said Ms. Williams told her that while they were on the telephone someone had pulled into her neighbor's driveway and put a ladder against the side of his house. Ms. Williams told her that the person appeared to be upset when he

left, and Ms. Conatser said she could hear over the telephone gravel being moved from the person's vehicle. She said Ms. Williams told her the person was driving a two-tone brown truck that looked like it had some red paint on the back of it. Ms. Conatser said that sometime later, Ms. Williams was at her house and saw a truck on television that Ms. Williams said looked like the truck at the victim's house the Monday before his body was found. Ms. Conatser was shown a picture of the defendant's truck and said that the truck on the television did not look like the defendant's truck. She said, however, that she would believe Ms. Williams if Ms. Williams identified the defendant's truck as the one that she saw at the victim's house and that it was possible Ms. Williams had forgotten what it looked like by the time she saw the truck on the television. She could not remember how long after March 29, 2004, she and Ms. Williams saw the truck on television.

Deborah Bruff, the defendant's current wife, testified that she married the defendant on May 5, 2004. She said that she and the defendant dated on and off for two years before they married. She said that in March 2004, she and the defendant were not dating. On March 29, 2004, the defendant came to her house in the morning to discuss their relationship. She said that she told the defendant to leave at 1:30 p.m., which he did, but that he came back soon afterward to pick up a book he had forgotten and left again. She said he came back to her house around 4:00 p.m. that day. She said he told her he needed to drop off a ladder because it was not secure in his truck, which had no tailgate. She said the defendant also asked for a pair of jeans that she previously offered to him. She said the defendant was wearing a dark pair of shorts, a long-sleeved shirt, and a short-sleeved T-shirt that day. She said she did not see any blood on the defendant's clothes. The defendant apologized to her for everything he had done to upset her and told her he would be leaving and would not bother her anymore. She said that the defendant's behavior that day was in character with the way he typically acted and that the defendant often found excuses to visit her or stay in contact with her. She said that on the next Monday, April 5, she drove the defendant to the bus station to get a bus to Michigan and that the defendant returned home on the following Thursday. She said the defendant changed his hair color using peroxide before he left for Michigan after seeing that her daughter had done the same thing. She said he had previously changed his hair color two or three times.

On cross-examination, Mrs. Bruff admitted that when she talked to Detective Friel on April 8, 2004, she told him that the defendant was "in a frenzy and mad rush" when he returned to her house at 4:00 p.m. on March 29. She said the ladder the defendant left at her house did not belong to her. She said the defendant left her driveway in a hurry, but she assumed it was because he knew she was mad at him for returning to her house. She said the defendant told her on April 2, 2004, that his truck had broken down and blown up. He did not tell her he left it outside Starwood Market. She said that on Monday, April 5, 2004, before taking the defendant to the bus station, she and the defendant discussed the victim's death. She said the defendant mentioned that he found out one of his friends had been shot in the back of the head and killed. She acknowledged a signed statement in which she said that in her opinion the defendant was "a pathological liar" and that the defendant once told her he had a gun and "would brag that he could always get out of trouble."

Frances Woodring, the defendant's mother, testified that she lived in Millington, Michigan and that the defendant visited her in early April 2004 to pick up a car. She said she sent checks and

money orders to the defendant in March 2004 that totaled $2600. She said she often sent money to the defendant. She said the defendant told her a friend of his had been killed and that he had visited the friend the week he died. She did not know if the defendant told her he visited the friend the day he died.

The defendant testified that he did not kill the victim. He said he met the victim through the victim's brother Chris Hixson, whom he met the day of the Super Bowl. He said he bought cocaine from the victim and became friends with him. The defendant said that one day in late March 2004, the victim came to the defendant's house and told the defendant that he had gotten beer on his clothes. The defendant said the victim asked for a change of clothes because he was worried that if he was stopped at a sobriety checkpoint, officers would smell alcohol on him. The victim changed his clothes and left his soiled clothes, which included a pair of denim shorts, at the defendant's house. The defendant said that after he washed the victim's clothes, the victim called and asked the defendant to retrieve a piece of paper on which a lady's telephone number was written from a pocket of his shorts. The defendant said he looked for the paper in the shorts' pockets but that it was illegible due to having been machine washed and dried.

The defendant testified that he returned the victim's shorts on Sunday afternoon March 28, 2004, the same day he intended to work on the victim's satellite system. He said that the evening before, the victim told him that Chris was arrested. He said that on Sunday afternoon the victim was "very nervous and scared" because he did not have enough money to bail Chris out of jail. The defendant said the victim told him that he would try to get more drugs to sell and that he was afraid of some of the people to whom he was dealing drugs. The defendant said that when he first arrived at the victim's house, he put the ladder up because he thought he would be working on the satellite connection. However, he said that after he and the victim talked, the victim received a telephone call, said he could not work that day, and asked the defendant to leave.

The defendant testified that on Monday, March 29, he visited his then-girlfriend, Deborah Bruff, at 8 or 9:00 a.m. in an attempt to reconcile with her. He said the attempt failed and he left around 1:30 p.m. He said he returned to her house to retrieve a book. He said he left again and went home. He said he was upset over his relationship with his girlfriend and wanted some cocaine. He said that he called the victim at 2:04 p.m. to ask about acquiring some cocaine but that he was unable to get cocaine from the victim. He said he did not go to the victim's house that day but stayed home and slept. He said that when he awoke, he wanted to see his girlfriend and remembered that he forgot to get a pair of pants that his girlfriend had offered him. He said he went to her house and, because she previously told him not to return to her house, made up the excuse about needing to leave the ladder with her. He said he told her he was going to Michigan and would never see her again because he hoped she would ask him to stay. He said that he was hurt when she did not and that he "laid rubber" in his haste to leave. He said he obtained cocaine from someone other than the victim later that evening.

The defendant testified that he worked in construction during the "building season" and found other jobs during the off-season. He said he had to quit one job because of a health condition.

He said that in March 2004, he had a deteriorating hip joint which made him walk with a limp. He said his mother sent him money in March 2004 that totaled $2600. He said that he changed his hair color before he went to Michigan on April 5 because his hair was turning gray, not because he was trying to disguise his appearance. He said he took his truck to Terry Amonette's store early in the morning on Tuesday, March 30 because he wanted to sell it. He said he also paid on his account at Starwood Market. He said that he was trying to find a way to get to Michigan to see his mother and to buy a vehicle. He said that Mr. Amonette first agreed to loan him a truck and that they drove to town together to get something for Mr. Amonette's truck. He denied asking Mr. Amonette for an alibi and admitted that he was "spaced out" because he used cocaine the night before and was upset over his relationship with Mrs. Bruff. He said he told Mr. Amonette he was concerned about the victim because the victim was dealing with dangerous people. He said he asked Mr. and Mrs. Amonette to tell people the truck had been at their store on Monday because he wanted Mrs. Bruff to think he had left for Michigan. He said he did not actually leave for Michigan until the following Monday, April 5. He said that by that time, he and Mrs. Bruff had reconciled and that Mrs. Bruff drove him to the bus station.

He testified that he asked Ms. Stallings to take pictures of him and that when he went to the drug store to develop the film on April 5, he saw a lady who was acquainted with the victim. Although he could not remember the lady's name, he said he recognized her face and she recognized him. He said that they talked about the victim and that the lady told him that the victim was shot in the back of the head. He said he repeated this information to Mrs. Bruff when he saw her later that day.

The defendant testified that he visited Michigan about five times after his initial visit between April 5 and April 8. He said that before each time, he called Agent Calahan to let him know. He said he did not want investigators to think he was running away. He said he was arrested in September 2004 while he was in the hospital recovering from hip replacement surgery. He said that he went back to work after being released on bail, that he no longer used cocaine, and that he was taking steps to turn his life around.

On cross-examination, the defendant admitted that he once spent $500 in one night on cocaine. He also admitted that the ladder was in his truck for several days before he took it to his wife's house and that the ladder did not belong to his wife. He admitted that he asked Mr. Amonette to tell a lie when he asked him to say the truck was at his store on Monday. He also admitted that he lied when he told his wife that the truck had blown up, and he said he did not know why he told his wife this lie. He admitted that he had a habit of lying but said he was not lying at trial. He said he visited the victim on Sunday, not Monday, and denied that he was running when he left the victim's house because, he said, he could barely walk at that time. He said he did not "tear out" of the victim's driveway. He denied that he was angry at the victim for cutting off his cocaine supply. He said that he made an unanswered telephone call to the victim on March 31, 2004, but denied doing it in an attempt to cover up his crime.

Agent Calahan testified on rebuttal that he found out about the victim's gunshot wound to the back of the head from the pathologist on Thursday, April 1. He said that only three to four investigators knew the details of the victim's wounds and that no road deputies were informed of them. He said that as a matter of policy, investigators do not reveal details such as the nature of a victim's injuries to anyone other than investigators. Agent Calahan read a local newspaper article about the victim, which was released on Tuesday, April 6, 2004, and which stated that the victim was shot at least once in the head but which did not state that the victim was shot in the back of the head.

The jury convicted the defendant of first degree premeditated murder, first degree felony murder committed during the perpetration or attempted perpetration of especially aggravated robbery, and especially aggravated robbery. As noted, the trial court merged the two murder convictions, and the defendant was sentenced to serve concurrent sentences of life and twenty-five years.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to establish his convictions. He argues that the state did not meet its burden of proving the convictions beyond a reasonable doubt through its use of entirely circumstantial evidence. He argues the evidence did not prove that he was the victim's assailant, that he committed aggravated robbery, or that he had the requisite intent for either felony murder or premeditated murder. The state counters that the evidence was sufficient to exclude all reasonable hypotheses save the guilt of the defendant.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

### A. Identity

The defendant argues that the state failed to prove sufficiently that he was the perpetrator of the offenses. We disagree.

Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). However, to warrant a criminal conviction on circumstantial evidence alone, the evidence "must be not only consistent with the guilt of the accused but it must also be inconsistent with his [or her] innocence and must exclude every other reasonable theory or hypothesis except that of

guilt." Pruitt v. State, 3 Tenn. Crim. App. 256, 267, 460 S.W.2d 385, 390 (1970).  While following these guidelines, we must note that the jury decides the weight to be given to circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marabel v. State, 203 Tenn. 440, 452, 313 S.W.2d 451, 457 (1958) (quoting 2 Wharton's Criminal Evidence 1611).

The evidence, taken in the light most favorable to the state, showed the following.  The victim was last known to be alive at 2:21 p.m. on Monday, March 29, 2004.  Pat Williams saw someone matching the description of the defendant and driving the defendant's vehicle drive to the victim's house in the afternoon of March 29.  This person put up a ladder against the victim's house, entered the victim's house, and left the victim's house in a hurry about twenty to thirty minutes later, taking the ladder with him.  The defendant left Mrs. Bruff's house between 1:30 and 4:00 p.m. on March 29.  When he returned to her house at 4:00, he dropped off a ladder that did not belong to her.  He left in haste and told his wife she would never see him again.  The next morning, the defendant left his truck at Terry Amonette's store, asked for alibis regarding the whereabouts of his truck and himself on March 29, and tried to find transportation to Michigan.  He made a remark to Mr. Amonette regarding someone being dead.  The defendant lied to his wife about what happened to his truck.  The defendant's DNA was found in the victim's pockets, and an expert testified that in his opinion, the defendant was the last person to leave DNA in the victim's pockets.  The defendant knew that the victim had been shot in the back of the head before it was likely that anyone other than investigators knew this information.

We conclude that this evidence is sufficient to exclude every other reasonable hypothesis except the identity of the defendant as the victim's assailant.  It is true that the defendant presented evidence that contradicted much of the state's evidence.  Joan Poisson said she saw the victim alive around 5:00 p.m. on March 29.  Diane Conatser said that her telephone conversation with Ms. Williams, during which the visitor in the truck arrived at and left the victim's house, ended by 2:00 p.m.  The defendant denied committing the crime, denied asking for an alibi, and presented an alternate explanation for the presence of his DNA in the victim's pockets.  However, conflicts in testimony, weight of evidence, and credibility of witnesses were determined by the jury, and we cannot second-guess those determinations.  When viewed in the light most favorable to the state, the circumstantial evidence is sufficient to prove identity.

## B.  Especially Aggravated Robbery

The defendant contends that the state's evidence was not sufficient to prove that the defendant committed especially aggravated robbery because it failed to prove he committed a theft from the victim.  He argues that although the state's evidence showed that the victim usually had money and a billfold in his pocket and was not found with money or a billfold, it did not show that the victim had money on his person at the time or immediately before he was killed or that the defendant was in possession of any of the victim's property or belongings.

Our code defines especially aggravated robbery as a robbery which is accomplished with a deadly weapon and during which the victim suffers serious bodily injury. T.C.A. § 39-13-403. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). The defendant was charged with especially aggravated robbery as a result of using a deadly weapon and causing the victim serious bodily injury while committing the theft of "cash/money" from the person of the victim. The defendant argues that the theft element of especially aggravated robbery was not sufficiently proven.

In the light most favorable to the state, the evidence at trial showed that the victim, a cocaine dealer, usually carried hundreds of dollars in his pants pocket along with a billfold. Police found the victim with no money or billfold in his pockets. They also saw that the victim's left front shorts pocket was partially pulled out of place. The defendant's DNA was found in the victim's pockets, and an expert testified that the defendant was likely the last person whose hands were in the victim's pockets. On March 30, 2004, Terry Amonette saw in the defendant's possession what appeared to be hundreds of dollars. The defendant paid $40 on his bill at Mr. Amonette's store with a $100 bill. The defendant was not working at the time.

We conclude that the evidence was sufficient to support the defendant's conviction for especially aggravated robbery. In so concluding, we find two unpublished cases of this court to be instructive. In State v. Jimmy Alexander, C.C.A. No. 03C01-9404-CR-00159, Sevier County (Tenn. Crim. App. Aug. 4, 1995), the defendant argued that his conviction for felony murder was not supported by the evidence because the evidence failed to prove that he committed the underlying felony of theft. The court agreed with the defendant, holding that the evidence was not sufficient to prove theft because "[a]lthough the victim's brother testified that certain pieces of jewelry that the victim always wore and the $2200 cash he received . . . were missing, there has been no evidence introduced to show that the defendant took these items or that they are or were in his possession; nor was there any testimony that the defendant had been seen with these items or the money." Id., slip op. at 18. In a similar case, this court distinguished Alexander and held that the evidence was sufficient to prove that the defendant murdered the victim in the commission or attempted commission of a robbery. State v. William E. Eakes, III, No. M2001-01420-CCA-R3-CD, Davidson County, slip op. at 18 (Tenn. Crim. App. July 1, 2003). In that case, the victim was found without his jewelry, his wallet, or his shoes. Id. The court stated that "[e]ven absent the evidence that the victim possessed a wallet, jewelry, and cash prior to the violent struggle in the motel room [with the defendant which resulted in the victim's death], the condition of the victim's pants pockets (inside out), the piece of chain jewelry [found on the defendant], and the missing shoes are strong circumstantial evidence of an attempted robbery." Id.

As in Eakes, we conclude that the facts of the present case distinguish it from Alexander and that sufficient evidence exists to prove that a theft, and hence especially aggravated robbery, occurred. Especially important in this case is evidence of the condition of the victim's pockets and the presence of the defendant's DNA in the victim's pockets. Moreover, evidence showed that the defendant was carrying more money than usual soon after the killing was believed to have occurred. As noted above, the defendant presented an alternate explanation for the presence of his DNA in the

victim's pockets.  The defendant also presented evidence that he obtained several hundred dollars from his mother in the weeks preceding the victim's death.  However, the jury apparently rejected these explanations.  The jury was free to infer from the evidence that the defendant took money from the victim, whom he also shot and killed.  The evidence is sufficient to prove especially aggravated robbery.

## C.  Felony Murder

The defendant argues that even if the evidence was sufficient to prove especially aggravated robbery, it was not sufficient to prove that he had the intent to rob the victim before killing the victim, as is required for a conviction of felony murder.  He argues that "nothing in the record suggests when the defendant formed the intent to commit robbery."

Our code includes as first degree murder the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ."  T.C.A. § 39-13-202(a)(2).  Our supreme court has held that for purposes of felony murder, the "killing may precede, coincide with, or follow the felony" but that the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim."  State v. Buggs, 995 S.W.2d 102, 106-107 (Tenn. 1999).  Whether the intent to commit the underlying felony existed prior to or concurrent with the killing is a question of fact for the jury to decide.  Id. at 107.  The requisite intent cannot be presumed from the act of committing the felony, but "a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing."  Id. at 108.

We conclude that the evidence, taken in the light most favorable to the state, sufficiently establishes the defendant's conviction for felony murder.  The evidence showed that the defendant had been a cocaine customer and personal acquaintance of the victim for several weeks.  The victim was expecting the defendant to work on the victim's satellite system the day the victim was killed.  The defendant went to the victim's house and was seen later hurrying out and driving away.  At some point during the time the defendant was at the victim's house, he shot the victim in the back of the head from a distance of a few feet, moved the victim's body, and then shot the victim again in an "execution type slaying."  There was no evidence of a struggle or that the victim was armed at the time.  After shooting the victim, the defendant took money from the victim's pockets.  The morning after the killing, the defendant paid some of his debts and arranged for transportation to Michigan, where he visited his parents and purchased an automobile.

From this evidence, a jury could reasonably infer that the defendant had the intent to steal money from the victim prior to, or at least concurrent with, shooting the victim.  Again, we cannot second-guess reasonable inferences made by the jury.  Thus, the evidence was sufficient to prove that the defendant killed the victim during the perpetration or attempt to perpetrate especially aggravated robbery.

## D. Premeditated Murder

The defendant argues that the state did not sufficiently prove that he murdered the victim with premeditation. The defendant was charged and convicted of killing the victim "unlawfully, intentionally, and with premeditation" in violation of Tennessee Code Annotated section 39-13-202(a)(1). That statute explains:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id. Without sufficient evidence of premeditation, a homicide in Tennessee is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992).

We conclude that the evidence is sufficient to establish that the defendant committed a premeditated murder. It is true, as the defendant points out, that not all the factors listed above are present in this case. For instance, evidence showed that the defendant was not calm after the shooting, but rather was "jittery" and nervous, and the state did not provide evidence that the defendant made any statements indicating his prior intent to kill the victim. However, there was sufficient other evidence to prove premeditation, including that the victim was unarmed and that there was no struggle between the victim and defendant prior to the victim's being shot. Moreover, the state provided evidence that the defendant shot the victim once in the back of the head from a few feet away and then a second time at close range, after having moved the victim's body. Also, having found that the evidence sufficiently established that the defendant killed the victim during the perpetration of a robbery, there was evidence of motive from which the jury could infer the presence of premeditation. See State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993) (listing as important to a jury's determination of premeditation and deliberation "facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred"). The circumstantial evidence was sufficient to prove premeditation.

## CONCLUSION

Based on the foregoing and the record as a whole, we conclude that the evidence is sufficient to justify the defendant's convictions for first degree premeditated murder, first degree felony murder, and especially aggravated robbery. We affirm the judgments of the trial court.

_____

                                           _____
JOSEPH M. TIPTON, PRESIDING JUDGE